I am hearing impaired. I do have a hearing aid, so I just want to let you know that. Also, I reserve a few minutes for questions. Counsel, that is not a microphone in front of you. It's a recording device, so I ask you to speak up, not conversationally, but speak up so we can hear you distinctly. Thank you, Judge. I do reserve two minutes for rebuttal. I'd like to be notified of that. This is a Social Security case. Counsel, we won't notify you. It's up to you to keep track of your time. Okay. So when it counts down to two minutes, that means you have two minutes left. Thank you. All right. This is a Social Security case, particularly a fibromyalgia case with secondary illnesses of depression and migraine headaches. The issues before the court are a credibility assessment of the ALJ, whether the treating doctor's opinion was properly rejected or rejected at all, and whether a mental impairment should be found to be severe on the step two of the five-step analysis. I'll start off with the credibility assessment of the ALJ. If the first prong of the cotton test is passed, or if the administration finds there is a medically determinable impairment, which they have, and there's no affirmative evidence of malingering, then the ALJ must give clear and convincing reasons to reject the claimant's complaints. The ALJ must also specifically identify what evidence undermines the claimant's specific complaints. That's Lester and Embree v. Bowen. In this particular case, the ALJ's rationale is very scant. Most of the rationale is simply repeating the criteria set out in Social Security Ruling 96-7P. The only specific reason the ALJ gives for doubting the claimant is to the extent of her activities at home. Yet he ignores the claimant's testimony that she has 20 bad days a month and 10 good. He ignores the claimant's testimony that if she worked four to eight hours a day, she'd be a very sick person. In other words, she paces herself according to what she's able to do. I also want to point to the court's opinion in Thomas. In Thomas, the court found that one of the ways of assessing the credibility of a claimant is looking at her work history. In Thomas, the court found that the claimant had shown a little propensity to work in a lifetime negatively, had extremely poor work history, and affected her inability to work. Let's compare Thomas to Ms. Browning. Ms. Browning worked 18 and a half years at Hughes Aircraft, where she started out as an assembler with a high school diploma, worked her way up to master scheduler, material planner, senior planner, material project administrator, and senior buyer. She then moved on to Beckman Industrial, where she worked there as well. She was self-employed for a few years and then worked for Shearer International. So her earnings record indicates a constant rise in income starting in 1973 from $703 to 1993, where she made $40,000 in that year. Counselor, can I ask you about the medical evidence in the record? In your view, was there a dispute between doctors or among the doctors in this case? Well, the medical evidence is really indicative of fibromyalgia. As I sort of think back to my mother and my grandmother used to have this argument about who was the sickest person in the family, and my mother said to my grandma, at least you have a diagnosis. And I think that's true of fibromyalgia as well. The medical record is indicative of somebody searching for a diagnosis, and I think the medical record itself indicates of somebody who is in severe pain and keeps going from one expert, one doctor, to the next looking for a diagnosis. And that's where you're going to find fibromyalgia, because it's still kind of on the edge of the medical profession in terms of diagnosis. There are doctors who don't really know what it is. And finally, if you look at the actual medical records, it's really consistent. You have three doctors doing the trigger point tests. Two of them, Dr. Smith and Dr. Wilson, found 12 points eight months apart, 12 out of the 18 which are required for fibromyalgia. That is an incredible consistency. In your view, what was Dr. Wilson's opinion regarding Ms. Browning's ability to work? Well, he found, I think he summed it up in his first statement, that as typical with fibromyalgia cases, the pain that she complains of is inconsistent with the objective evidence. I think that's really the whole nexus of this case. What did he say about her ability to work, though, about the extent of her disability? I don't remember that. I'm sorry I have to say that. I don't have that in front of me. But it was a one-time examination. And if you compare that, and I'm just assuming that he probably said she could work, but I don't really know. But if you compare that to Dr. Smith's evaluation of her, which he found her disabled, which was through a longitudinal number of visits, again, fibromyalgia, whether Dr. Wilson found her able to work or not, to assess her one time is not going to really give you a true analysis or true assessment of her ability to work. But isn't the ALJ, if there's a conflict in the record from the medical examiners, isn't the ALJ entitled to resolve that conflict? It's entitled to resolve the conflict, but if he's going to give reasons to reject the treating doctor's opinion, they must be clear and convincing. He didn't even mention Dr. Smith's opinion. So he failed in that regard. His main reason for rejecting the complainant's complaints is that she had a life, basically, and that she wasn't vegetating in a dark room, as the court notes in Fairview Bowen. She was attempting to get beyond her illness by doing some stuff at home. And, again, I think in the dissent that Judge Ferguson wrote in Rollins v. Masonary, the Social Security Act is not there to penalize somebody for trying to get beyond a debilitating disease. And I think that's, again, what's happened here in this particular case. Again, with the medical record, if you look at the claimant going from doctor to doctor, specialist to specialist, seeing doctors 29 times in a two-year period, that's reflective of someone who's in severe pain. Also, the Social Security regs direct the ALJ to look at other activities in terms of assessing credibility. She participated in a fibromyalgia study. She participated in classes in fibromyalgia. She did stretch exercises on a regular basis. In terms of her medication, she took Flexeril, Celebrex for arthritis, Effexor and antidepressant, and Vicodin and Onetabasis. None of these facts or evidence were mentioned by the ALJ in his assessment. He just repeated the criteria without actually going into giving specific reasons that were based upon the evidence of record. Counsel, the difficulty I have with this case, at least Dr. Wilson says, that the functional limitations are based more on subjective pain limitations, as opposed to any clinical medical findings. So what's your best case authority for the proposition that functional limitations predicated upon subjective pain complaints constitute a disability? What's your best case authority for that? Well, pain is subjective by very nature. You're never really going to be able to do a functional assessment of pain. I understand that, but I'm asking you for your best case authority to support your argument. Well, it would go back to just the cotton test in terms of determining whether somebody has a medically determinable impairment that could reasonably cause the symptoms complained of. That is, she has a medically determinable impairment. Then the next step under the cotton test is to assess whether she's credible or not. That assessment was not done. My time is about up here, so thank you very much. Thank you, Counsel. Good morning, Your Honors. David Johnson, representing the Social Security Administration. There was more than a scintilla of evidence supporting the ALJ's decision it should be upheld. We agree with Ms. Browning that she used to work very hard. She became ill, and then the question becomes what functional limitations remain, and do those prevent her from doing substantial gainful activity? There's no question she has pain. She has some functional limitations. But in answer to Your Honor's question about what Dr. Wilson had to say about her ability to work, I don't believe he made an opinion or offered an opinion as to whether she could work. He did say that her complaints were subjective, and that consistent with other medical doctors who examined Ms. Browning, she was able to fully reach, hold, grasp, manipulate, rise, stand, and walk from a seated position. These are the functional limitations that the ALJ considers. What did he mean when he said the complaints were subjective? I believe he means that she tells me she has this problem. Isn't that the nature of this particular illness? Yes, it is. It makes fibromyalgia cases very difficult. There aren't any objective symptoms. That's essential to this particular illness, isn't it? I wouldn't say that there aren't any, in that she alleges she has weakness. Muscle weakness is common. On strength testing, with several examinations, she demonstrated no weakness. So that's a contradiction that could be measured. But there is another test that the doctors use, isn't it, touching for pain? Trigger points. They found that she was in the trigger points to show that she had this illness. That's correct. And there's no dispute that she has it. It is a severe impairment, meaning it causes more than minimal work-related limitations. That's step two. Then we have to assess, when we go through step three, that she doesn't meet a listing, and there is no listing for fibromyalgia, but she doesn't meet any other listing either. Then we have to assess, what's her residual functional capacity for work activity? And that's measured not in doctors' opinions that she is or is not employable, and it's not entirely measured based on her subjective complaints. There must be some medical evidence that's objective and that's demonstratable in a laboratory-type setting or a clinical-type setting. What's your best case authority for the proposition that there must be objective evidence to support complaints of pain? I thought our case law was just the opposite. Well, I'll start with the regulations, that disability can never be premised based solely on objective complaints alone. What about mental defect? Even mental defects are demonstrable through testing, psychological testing. In this case, the mental defect that there was an impression of, and that is dysthymia with Dr. Olson, Dr. Olson didn't provide us with how he got to his opinion that she had dysthymia and didn't provide us with how he got to an assessment of the global assessment of functioning of 50. As you note from the briefs, that level of global assessment of functioning has examples such as suicidal ideation, which isn't present here, obsessive rituals, which aren't present here. The ALJ properly didn't need to include functional limitations from the impression of dysthymia, which was never substantiated at any other point in the record, because there were no functional limitations specifically opined by Dr. Olson and because there's no evidence that they continue. In fact, her testimony, her statements to Dr. Olson and her testimony are contrary to the idea that she had any sort of dysthymia or just depression. Well, you're claiming that she was malignant with injury? No. There's no evidence of malignancy. She did everything possible, humanly possible, to try to get this defect of hers cured. Through the universities, through everything. I've never seen a better example of a person working as hard as she did to help herself get back to work. Her opinion in testimony was that the frustration with fibromyalgia is that it keeps her from going the extra mile. And that may be true that she experiences limitations from the very challenging and difficult work that she used to take on before she came down with the disease. But disability is for those who are unable to engage in any substantial gainful activity. That's what the law authorizes disability status for. Except her treating physician. Her treating physician did opine that she's unable to work. But the ALJ gave sufficient reasons for discrediting that opinion, the first of which is that it's reserved to the commissioner. It's beyond the expertise of any medical doctor to assess vocational limitations. Harman talks about that. It's a medical and vocational component to disability. Secondly, disability has a specific meaning under the regulations and under the statute. You're saying that there's absolutely no medical deformity or medical problem that this woman has? No, I am not. You're not saying that? No. You're saying that there are medical problems? Yes. And the question is, do the medical problems keep her from working? Is that the issue in this case? Yes. Okay. And her treating physician says they are. That's correct. Keep her from working. That's correct. And you disregard that entirely? Well, the ALJ You have to have to take your position. We disregard the opinion that she can't work. We don't disregard the functional limitations assessed by Dr. Smith. Those functional limitations, the regulations tell us, are the key to whether or not she retains the capacity. And the vocational expert testified, and Ms. Browning hasn't challenged vocational expert's testimony or the ALJ's application of it, that someone with the limitations set out by the ALJ, when he looks at the record as a whole, including the limitations opined by Dr. Smith, could perform her past relevant work. And the issue of whether she could perform other work existing in the national economy, jobs such as house sitter, hasn't even been explored. See, I have the feeling that the government, you're the government, takes the position that for people like this lady or anybody else to recover under the disability laws has to be bedridden before they can accomplish that. Is that right? No, that's not right. Almost bedridden. I can see how Most of the time bedridden. This court receives only the most difficult of the most difficult cases. My office, when we receive a case after it's been through the administrative procedure, on average sends 50% back to the agency for reconsideration. The district courts filter out others. This is a difficult case, absolutely. And there's no question that she has fibromyalgia, which causes her real limitations. But the ultimate question is, is there more than a scintilla of evidence that those real limitations prevented her from doing any substantial gainful activity? And there is more than a scintilla, is what I'm telling you. At one time, G.K. Chesterton, who is a, you know who he is, Father Browning made this statement. He said that English judges are not cruel. They just get used to things. And maybe that's what happens with these ALJs, huh? They just get used to things. They are not above human failings. And neither is the government, neither is this court. None of us are. The best we can do is take what Congress told us to do. Gain input from everyone involved in the system. Set up a regulatory structure. Try and implement it. And when there's a very close case, look hard at the evidence. Look at what Dr. Smith had to say. Look at what Ms. Browning herself had to say, that it kept her from going the extra mile. That's to be lauded, absolutely. We need more citizens who want to go the extra mile, regardless of their abilities. If everyone strived, we'd be a lot better off. And disability benefits are awarded to those who carry the burden of proof, of showing that they are unable to engage in any substantial gainful activities. Counsel, you were in the process of articulating the reasons that support the ALJ's disregard of the medical opinion. Could you please continue with that? Because so far you said that it's a vocational issue and that the regulations permit it. But I didn't hear anything in terms of the evidence itself as to why the ALJ discarded the medical opinion of the treating physician. Dr. Smith, it's the functional limitations that he accepted and disregarded the vocational aspect and the reserve, the aspect of Dr. Smith's opinion that is reserved to the commissioner. 96-5-P tells us specifically that doctors' opinions, even from treating sources, about issues such as this person can't work, are not entitled to special significance. And again, that comes back to the fact that we are interested in what can they still do despite their limitations. If they can't still perform substantial gainful activity, then they're disabled. Thank you. Are you saying that the ALJ gave clear reasons for accepting the medical opinion of Dr. Smith and also clear reasons for rejecting the opinion of Dr. Smith that this person was disabled? That would be one way of phrasing it, yes. He looked at the medical findings. And accepted the findings. Functional limitations, yes, but not the vocational aspect. The problem I have with this case is, if that's true, if he accepted the medical limitation that she is suffering from an illness and heard her subjective complaints about her complaints and also her testimony about the limitations on her daily activities, why doesn't that indicate that she is disabled? Well, Dr. Smith apparently felt it did. But when the ALJ, who applies the regulations of Social Security law, which Dr. Smith wasn't necessarily doing. I'm not worried about Dr. Smith. I'm worried about what we're going to do. Okay. And we have to look at what Dr. Smith said and also what she testified to about her limitations on her daily activities. I would note that she testified that she's busy all day from either 6 in the morning to 2 in the afternoon or from 8 in the morning to 4 in the afternoon. Isn't that on good days? I believe, I think she said that was an average day. It may have been good days. I think she said on a good day she can do more than she normally does. That's an 8-hour workday. Now, that's not what the ALJ found. The ALJ compared all of her statements and found some contradictions about her subjective complaints. But her activities, including taking care of her mother, who the ALJ noted had a history of cancer, taking care of herself, running errands, shopping, socializing, church, new hobbies, trying to keep herself busy and do things, reading the newspaper, is not indicative of someone who has functional limitations as great as she has alleged in her subjective complaints. Thank you, counsel. Thank you. Rebuttal. There's no testimony that the claimant said she was busy all day long. That's just inaccurate. She testified that she could work a couple of hours during the day and ER 048. Any more than that, I think the quality of life has to try to work four hours, eight hours. I think I'd be a very sick person all the time. The ALJ, as far as Dr. Smith, the ALJ gave absolutely no reason whatsoever to reject Dr. Smith's opinion. All the reasons you've heard today are the commissioner's post hoc or the district court's. That is a violation of due process. The ALJ must give the reasons itself. It didn't even mention Dr. Smith's opinion that the claimant was disabled. And as far as accepting Dr. Smith's functional limitations, the only thing Dr. Smith ever said about that was that fatigue and pain would cause her to not be able to work full time. And that's the other issue, is that she can't work full time. She could work part time. So by doing these activities during the day, that doesn't discredit her claim that she can work part time. And that's all we need to do is to establish disability. Thank you. House, let me ask you, the ALJ said that her statements concerning her impairment and its impact on her ability to work are not entirely credible in light of her own description of her activities and lifestyle. The degree of medical treatment required discrepancies between the claimant's assertions and information in the report and the medical history. Do you think that's sufficient reason to disregard Dr. Smith's opinion? Well, it's very general. Again, it's a recitation of the fact that she's supposed to go through, but it doesn't really tell you what are the inconsistencies, how are they inconsistent. Because, in fact, they aren't. She had 12 out of 18 trigger points. If she was somebody who was faking pain, you might see more like 17 out of 18 trigger points. Dr. Wilson did a control test on her. He only found two out of eight control points. This is a person that is not jumping every time you touch her. All the medical records show that she is truthful and credible and consistent. All right. Thank you, counsel. Thank you very much. The case just argued is submitted. The next case on calendar for argument is Enno v. Salem-Kaiser-Yellow Cab. May it please the court. John Razor for Plaintiff David Enno. Mr. Enno, a 74-year-old gentleman who is a cab driver for Salem-Kaiser-Yellow Cab, can tell the employer of Kane,
judges: Alarcon, Ferguson, Rawlinson